GADOL, ET AL. *v.* DART DRUG CORPORATION OF MARYLAND ET AL.

[No. 193, September Term, 1959.]

*Decided May 13, 1960.*

*Motions for rehearing, and for modification of the opinion filed by the appellees on June 10, 1960, denied June 29, 1960; motion of the appellee, Dart Drug Corporation, for a remand for further proceedings without directing the issuance of a permanent injunction, filed June 10, 1960, denied June 29, 1960.*

*Motion of the appellee, Dart Drug Corporation, for a stay of mandate filed June 10, 1960, granted to the extent and upon the terms stated in Order of Court dated June 29, 1960; motion of the appellee, Peoples Service Drug Stores, Inc., for a stay of mandate filed June 10, 1960, granted in the same Order of Court to the extent that the mandate shall be stayed as to the said appellee so long as it shall be stayed as to Dart Drug Corporation.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and HORNEY, JJ.

*Joseph S. Kaufman,* with whom were *Bernard S. Melnicove* and *Stedman Prescott, Jr.,* on the brief, for appellants.

*William B. Kempton,* with whom were *F. Fulton Bramble* and *James Henry Murdock,* on the brief for Peoples Service Drug Stores, Inc., one of the appellees.

*J. E. Bindeman,* with whom were *Leonard W. Burka* and *Plummer Shearin* on the brief, for Dart Drug Corporation of Maryland, the other appellee.

BRUNE, C. J., delivered the opinion of the Court.

In this Fair Trade Act case the complainants-appellants, Ellis and Selma Gadol, are the proprietors of the Four Corners Pharmacy, which is on the outskirts of Silver Spring in Montgomery County, and the respondents-appellees, Dart Drug Corporation of Maryland (Dart) and Peoples Service Drug Stores, Inc. (Peoples), each own and operate another drugstore in the vicinity. Silver Spring is in the area which is suburban to Washington, D. C., and there is no Fair Trade Act in the District of Columbia. Dart owns one other drugstore, at Bethesda, also in the Washington suburban area. Peoples' store in direct competition with the Gadols is one of a chain of drugstores operating in and around Washington. The Gadols brought this suit in the Circuit Court for Montgomery County for injunctive relief, both temporary and permanent, to restrain Dart and Peoples from advertising and selling the products of four named manufacturers at less than the minimum retail resale prices fixed by those manufacturers under the Maryland Fair Trade Act (Code (1957), Art. 83, §§ 102-110, the "Fair Trade Act" or the "Act"). An interlocutory injunction was issued by the late Judge Reeves on July 28, 1958. Following a hearing more than a year later, an order dissolving the interlocutory injunction, dismissing the bill and thereby denying a permanent injunction, was entered by Judge Pugh on November 12, 1959. The Gadols appeal from that order.

This appeal turns upon whether or not there has been reasonable diligence on the part of the manufacturers to enforce adherence to their Fair Trade prices. Judge Pugh held that there had not been, and he dismissed the bill. There was no denial—on the contrary it was admitted—that the respondents had advertised and made sales at less than the manufacturers' Fair Trade prices. The defense was that the complainants were barred by lack of diligence of the four manufacturers in enforcing compliance with such prices, and hence that no valid Fair Trade prices were in existence, and action against these respondents is claimed to be discriminatory.

The four manufacturers whose products are involved are Johnson & Johnson, Bristol-Myers Company, Mead-Johnson

Company, and Miles Laboratories, Inc. Each of them has taken appropriate steps to establish Fair Trade prices, and there seems to be no question that each has given adequate notice to the trade of those prices and of changes from time to time made therein. Their respective usual Fair Trade enforcement procedures and policies, as shown by the evidence, may be summarized as follows:

Johnson & Johnson. Notice of violations is received from their own salesmen, competitors, a local pharmaceutical association or a Fair Trade Service Bureau. Upon receipt of a complaint, a salesman will call upon the alleged violator and request that he raise his prices to the established minimum. If this fails, a letter is sent to the violator from the company's home offices. Thereafter a salesman will follow up the letter to see whether compliance has been obtained. Professional shoppers are sometimes employed. If compliance is not obtained, the company's counsel sends a registered letter to the violator. If all of these efforts fail, counsel would be employed to bring suit, but suit would be brought only if negotiations failed.

Bristol-Myers Company. Violations are reported by salesmen or competitors. Violators are notified by registered letter, and this is followed up by a visit from a salesman. If compliance is not obtained, a professional shopper makes three separate shoppings; and if violations still continue, the evidence is turned over to local counsel with instructions to sue.

Mead-Johnson Company. Violations are reported by salesmen and competitors. Salesmen are instructed to watch advertisements in newspapers. After a violation is reported a warning letter is sent to the alleged violator and shoppings are made to check compliance. If compliance is not obtained, a second warning letter is sent; and if this is ineffective the matter is referred to the home office.

Miles Laboratories, Inc. Notice of violation is received from salesmen or competitors, and a letter is written to the alleged violator. If there is no correction, a visit by a salesman or by counsel, who is also an assistant secretary of the company, follows. If violations continued, suit would be filed.

The implementation of the manufacturers' procedures and

policies in Maryland in general and in the Washington suburban area in particular may be thus summarized:

Johnson & Johnson. Ten instances were cited where the above procedures resulted in compliance. No suits had to be brought. The situation in Maryland was complicated by the giving of trading stamps by a number of dealers. Johnson & Johnson amended their contracts and prices to meet this by permitting a 3% merchandising allowance. Action had been deferred on this matter pending decision in the case of *Dart Drug Corp. v. Lilly,* 216 Md. 20, 139 A. 2d 272 (decided March 3, 1958). Johnson & Johnson has had no problem with Drug Mart, another dealer in the Washington suburban area, since July, 1958. Dart and Peoples were visited several times and Johnson & Johnson was on the point of suing Dart when this suit was filed.

Bristol-Myers Company. Testimony as to this company was limited to the year 1958 and thereafter. In 1958 the Company was notified of violations by Dart and Peoples and perhaps by one or two others. In September, 1958, Bristol-Myers had sixty-four retail outlets shopped for five of its products, and ten violations were reported. Seven were thought to have been inadvertent; all of these violations were corrected within two weeks as a result of salesmen's visits. At the time of the trial in November, 1959, a staff attorney for Bristol-Meyers testified that since an investigation of the Company's enforcement policy in 1958 his Company had notice of only six violators. Three violators in Maryland, two of them in the Washington suburban area, were reported in the six months preceding the trial. Two of the three offenders ceased violations promptly after notification. The case against the third was turned over to Maryland counsel for action and suit was filed in September, 1959. Bristol-Myers has probably several thousand outlets in Maryland. It had contemplated suit against Dart and Peoples when this suit was brought.

Mead-Johnson Company. Suit was brought by Mead-Johnson in the United States District Court for the District of Maryland against Dart. The case did not come to trial because of the pendency of another case involving several questions, among them the effect of giving trading stamps. This

other suit was originally filed in the Federal Court but was refiled in a State Court in Baltimore. The plaintiff drug manufacturer in that case is not one of the four manufacturers whose products are involved here. In several instances, compliance has been obtained without litigation. One such instance involved a Peoples Drug store at College Park, in Prince George's County.

Miles Laboratories. Suits were brought by this corporation in the Federal Court at Baltimore against Dart and Peoples in December, 1957. They have not come to trial and have been held under a stay order for the same reason that the Mead-Johnson suit against Dart has not yet come up.

About two weeks after the determination of the instant suit in the Circuit Court for Montgomery County Johnson & Johnson brought suit against Dart in the Federal Court at Baltimore, and on January 19, 1960, Judge Watkins filed an opinion holding that the plaintiff was entitled to a preliminary injunction. See The Daily Record (Baltimore), January 29, 1960. Judge Watkins was, of course, informed of Judge Pugh's decision in the instant case. He accepted it (unless reversed by this Court) as a binding determination that as of November 10, 1959, Johnson & Johnson's enforcement of its Fair Trade prices had not been sufficiently diligent, but he found that as of the time of the hearing before him on January 18, 1960, it was sufficiently diligent. He noted various actions taken by Johnson & Johnson during the interim to enforce compliance, including (but not in this exact order): (i) demands made upon Dart; (ii) meetings of Johnson & Johnson's local representatives, at which they were instructed to call upon the trade and give notice of Johnson & Johnson's intention to enforce Fair Trade prices, and were also instructed to increase their efforts to detect violations; (iii) the sending of notices to some 1425 known retailers in Maryland; (iv) the employment of a detective agency as shoppers to check up on possible violations; (v) a conference with the Prince George's-Montgomery Pharmaceutical Association; (vi) a conference with the executive vice president of Peoples. At this last conference Peoples indicated a preference for Fair Trade and a willingness to comply, if competitors were prevented from price cutting. Johnson & Johnson had

also sued a dealer at Dundalk (in the Baltimore suburban area), and on the day of the hearing expressed its intention to sue another in Montgomery County. This suit was filed the next day, the date of Judge Watkins' opinion.

Judge Watkins' opinion also pointed out that five Fair Trade cases on the docket of the Federal Court had been temporarily stayed, with the right to any party to request the Court to lift the stay at any time, pending the determination of similar cases in the Courts of Baltimore City, particularly cases involving questions arising from the giving of trading stamps or cash register receipts.

Of course, the evidence of the above recent activity by Johnson & Johnson was not before Judge Pugh and cannot affect our decision as to whether or not his order here involved should be affirmed or reversed. It does point up the fact that more could have been done by Johnson & Johnson and by the other three manufacturers than was done; but that is not determinative of the case. The question is whether enough has been done, that is, whether or not there has been reasonable diligence by the manufacturers in the enforcement of their Fair Trade prices. *Hutzler Bros. Co. v. Remington Putnam,* 186 Md. 210, 46 A. 2d 101; *Dart Drug Corp. v. Lilly, supra,* 216 Md. 20, 139 A. 2d 272; *General Electric Co. v. Home Utilities Co.,* 131 F. Supp. 838 (D. C., Md.), affd. 227 F. 2d 384 (C. A., 4th).

The respondents rely heavily on voluminous newspaper advertisements by the drugstores and other stores in the Maryland area suburban to Washington offering products of the four manufacturers at less than Fair Trade prices and on numerous purchases by persons employed as shoppers made at various stores in the Washington suburban area at less than Fair Trade prices. (Some of the affidavits of shoppers show that some negotiating was done to obtain such lower prices.) The respondents contend with a good deal of force that it would not have imposed any great burden on the manufacturers to learn of such advertisements and to take policing action based thereon.

There seems to be little doubt that two factors have militated against the most aggressive enforcement of Fair Trade prices in this case. One is the proximity of the Washington

suburban area to the District of Columbia which has no Fair Trade Act. The other is the uncertainty relating to the effect of giving trading stamps or the making of similar allowances, which is a bone of contention in other cases now pending and above referred to. (Of the four manufacturers here involved only one, so far as the record shows, has moved to solve this problem by amending its contract.) The giving of trading stamps in some stores was mentioned in *Dart Drug Corp. v. Lilly, supra,* but that case did not adjudicate the effect thereof. The opinion noted that there had been some question as to whether the giving of trading stamps constituted a violation of Fair Trade contracts, that courts had disagreed on the question, that the parties to that case then conceded that it did constitute a violation, and that the widespread use of these stamps was a comparatively recent development.

The learned trial judge in the present case adopted flatly the view that because of the proximity of the Washington suburban area to the non-Fair Trade area of the District of Columbia the "manufacturers are duty bound to be more alert and aggressive than in other parts of the State of Maryland." No authority is cited in support of this statement.

A practical view quite at variance with it is expressed in a note entitled *The Operation of Fair Trade Programs,* 69 Harv. L. Rev. 316, in which (at p. 326) the authors state: "In contrast to the comparative ease of enforcement in rural regions, enforcement is practically impossible in areas contiguous to nonfair-trade states or the District of Columbia. Since consumers can readily travel to the nonfair-trade area to make purchases, dealers in the fair-trade area are under pressure to meet the cut prices. In such a situation, rigid enforcement of the fair-trade price would only deprive retailers in the fair-trade area of a great deal of business." We find it difficult to adopt either of the conflicting views dogmatically, though the proximity of a non-Fair Trade area is, we think, a factor to be considered in determining the question of reasonable diligence. For the manufacturer who wishes to enforce Fair Trade prices the proximity of such an area neither excuses throwing in the sponge nor demands the impossible in efforts or results.

The manufacturers whose products are involved in this case

were certainly not overzealous in policing prices in the Washington suburban area in Maryland or in bringing suits to maintain their Fair Trade prices for some months prior to the institution of this suit, and they appear to have been well satisfied to let the Gadols take the initiative. Indeed, Mr. Gadol's testimony indicates that the complainants brought this suit themselves because the manufacturers would not bring suit. On the other hand, it is a fair inference from the record that the Gadols have had rather full cooperation from these manufacturers, at least in assembling and presenting the evidence, in this case. It is also true, as pointed out in the above note in 69 Harv. L. Rev. (at p. 343) that a suit by a retailer makes it possible to deal in one case with the Fair Trade products of several manufacturers. This note also suggests difficulties which might be encountered if one or more manufacturers joined in such a suit. It should also be borne in mind that for over a year before the hearing of this case on the application for a permanent injunction, these respondents, who had been two of the most active price cutters in the area, were under the restraint of the temporary injunction, and that Dart was once fined for contempt for violation thereof while it was in force.

The actual enforcement procedures of the four manufacturers, at least up to the point of bringing suits, although varying somewhat as between themselves, followed much the same pattern as was involved and held sufficient in *Hutzler Bros. Co. v. Remington Putnam, supra; Donner v. Calvert Distillers Corp.,* 196 Md. 475, 77 A. 2d 305; and in *Dart Drug Corp. v. Lilly, supra.* In the last case the manufacturer's procedure was thus summarized: "It was shown that Lilly relies largely, in its enforcement program, upon complaints received from local druggists in active competition with an alleged violator, and complaints received from several active druggists' associations. It also instructs its salesmen, of whom there are 18 in the State, to report violations observed. Upon receiving a complaint, it was shown that the practice was to have the district manager or a salesman investigate and talk to the offender. If this is not successful, the manager of the legal department sends a registered letter

of warning. If necessary, this is followed by the institution of suit." (216 Md. at 24.)

Similar procedures were also held to show reasonable diligence in such cases in other courts as: *General Electric Co. v. Home Utilities Co., supra; Eastman Kodak Co. v. Home Utilities Co.,* 138 F. Supp. 670 (D. C., Md.), affd. 234 F. 2d 766 (C. A., 4th); *Lionel Corp. v. Klein,* 114 A. 2d 652 (Del. Ch.); *General Electric Co. v. R. H. Macy & Co.,* 103 N. Y. S. 2d 440, 199 Misc. 87, app. dis. (voluntary order of appellant followed by court order of dismissal as moot) 278 App. Div. 939, 940, 105 N. Y. S. 2d 1003; *General Electric Co. v. S. Klein-on-the-Square, Inc.,* 121 N. Y. S. 2d 37 (N. Y. Sup. Ct.). See also note, 69 Harv. L. Rev., above cited, pp. 335-336. *Contra* to cases above cited, on facts almost identical with those in the *General Electric Co. v. S. Klein-on-the-Square, Inc.,* is *General Electric Co. v. Federated Dept. Stores, Inc.,* C.C.H. Trade Reg. Rep. (1955 Trade Cas.) Par. 68098 (E.D., Wis.).

It is settled that a manufacturer need not sue all violators of his Fair Trade prices in order to show reasonable diligence. *Hutzler Bros. Co. v. Remington Putnam; Donner v. Calvert Distillers Corp.; General Electric Co. v. R. H. Macy & Co.;* all above cited.

The evidence, we think, shows that, on the whole, the four manufacturers were successful, both in the general trading area here involved and in the State of Maryland as a whole (cf. *Dart Drug Corp. v. Lilly, supra*), in obtaining compliance without resort to litigation in cases in which they received complaints of violations. Their alleged lack of diligence rests largely on their failure to do more to police prices and on their failure to bring suits. We think, however, that the action which we have already outlined, which they did take and its general efficacy in obtaining compliance in cases of reported violations was, in the light of existing circumstances, sufficient to show reasonable diligence in enforcement, notwithstanding the fact that these manufacturers failed to take some action which they well might have taken (such as that, largely by way of intensification, which Johnson & Johnson has in fact taken since the decision of this case by the Circuit

Court). Existing doubts as to the effect of giving trading stamps or the like, the pendency of *Dart Drug Corp. v. Lilly, supra,* the pendency of other cases which directly involve the question of giving trading stamps and the like, and the pendency of this very case, with its long outstanding temporary injunction, afforded, we think, reasonable grounds for these manufacturers not being more aggressive in enforcement during the year or more preceding the filing of this suit and during the year and more of its pendency. We conclude that despite their temporary lack of aggressiveness, there was sufficient effort, and successful effort, in accordance with established patterns of enforcement as to negate a waiver or abandonment of Fair Trade prices on their part, or such lack of diligence as would bar relief. In so holding, we assume, and it has not been otherwise contended, that the complainant retailers stand in no better position on the question of reasonable diligence than do the manufacturers.

There is little, if any, dispute with regard to the facts of the case. What constitutes reasonable diligence is, we think, a mixed question of fact and law. We are not unmindful of Rule 886 a of the Maryland Rules, which provides that where a case has been tried by the lower court without a jury, this Court will review the case both upon the law and the evidence, but that the judgment (which includes an order or decree) of the lower court will not be set aside on the evidence unless clearly erroneous, and that due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses. That opportunity is not involved here, since there is no real conflict in the evidence. In this case we think that the Chancellor drew an erroneous legal conclusion from the evidence before him as to what constituted reasonable diligence and that the order of dismissal should therefore be reversed.

The case will, therefore, be remanded for further proceedings and for the entry of a decree not inconsistent with this opinion. Such a decree should provide for the issuance of a permanent injunction. It might also expressly grant to the respondents leave to apply for its dissolution, in whole or in part at any time if the manufacturers, or any of them, should cease to exercise reasonable diligence to enforce their respec-

tive Fair Trade prices in the trading area where the respondents and the complainants are in competition. (The rights of the complainant retailers to relief under the Fair Trade Act would not seem to extend beyond such an area.) In a number of cases injunctions have been granted subject to conditions as to more intensive or extensive enforcement of Fair Trade prices. See *General Electric Co. v. R. H. Macy & Co., supra; Colgate-Palmolive Co. v. Max Dichter & Sons, Inc.,* 142 F. Supp. 545 (D. C. Mass.); *Fishman v. Kaye,* C.C.H. Trade Reg. Rep. (1950-51 Trade Cas.) Par. 62718 (N. J. Super. Ct.); *Seagram-Distillers Corp. v. New Cut Rate Liquors, Inc.,* on temporary injunction, 221 F. 2d 815 (C. A., 7th), reversed on permanent injunction for lack of jurisdiction, 245 F. 2d 453 (C. A., 7th).

> *Order reversed and case remanded for further proceedings and the entry of a decree not inconsistent with this opinion; costs to be paid by the appellees.*